UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF GEORGIA
STATESBORO DIVISION

ARDUS MEDICAL, INC.,

    Plaintiff,

v.                           607CV011

EMANUEL COUNTY HOSPITAL
AUTHORITY d/b/a EMANUEL
MEDICAL CENTER,

    Defendant.

## ORDER

## I. INTRODUCTION

Plaintiff Ardus Medical, Inc., alleges that it sold to defendant Emanuel County Hospital Authority, d/b/a Emanuel County Medical Center (EMC) IV pumps for which EMC has since refused to pay. Doc. # 1. Ardus thus brought this collection case and moves, over EMC's opposition, for summary judgment against EMC. Doc. ## 27, 35. The Court will apply the summary judgment standards recounted in *Beard v. Banks*, 548 U.S. 521 (2006) and *Jacobs v. Gamez*, 2008 WL 899239 at * 3 (M.D.Fla 3/31/08) (unpublished).

## II. BACKGROUND

In 2004, Ardus representative Sarah Shannon contacted EMC to market Ardus products to it. Doc. # 30 ¶ 2; # 35 ¶ 2. Months later, EMC contacted Ardus to buy some IV pumps. *Id.* ¶ 3. Shannon suggested that EMC buy a specific brand of "re-marketed" IV pump from Ardus. *Id.* ¶ 4; *see also* doc. # 37 at 9, 11-12. Following negotiations, EMC issued to Ardus a Purchase Order (P.O.) for them but wrote "contingent upon board approval" on the bottom. Doc. # 30 ¶ 5; # 35 ¶ 5. On 12/23/05, Ardus contacted EMC Director of Purchasing Rebecca ("Becky") Drake about finalizing the P.O. and, says Ardus, EMC confirmed it. Doc. # 30 ¶ 6.[1] Shannon thus proceeded with the $166,746 sale and on 12/31/05 invoiced EMC accordingly. *Id.* ¶¶ 7-10; *see supra.* n. 1. Under Ardus's version of what transpired, these facts are straightforward and EMC thus must pay its $166,746 invoice.

Except that it is not so simple, says EMC, doc. # 35 (brief), and EMC-witness deposition testimony bears that out. According to EMC staff, EMC budgeted for IV pumps but, because it is financially strapped, it had been stalling on IV pump purchases. Doc. # 33 at 30. That reality factored into the process of attempting to buy the pumps from Ardus. They first were brought to EMC for evaluation. Doc. # 33 at 56; # 32 at 24-29. After a second visit, EMC's then-Chief Financial Officer (CFO) H.D. Cannington, Jr. signed a "contingent" P.O. Doc. # 33 at 56; # 32 at 28-30; *see also* # 32 at 76 ("[a]nd I've dealt with a lot of vendors in my experience and with contingent POs").

Why EMC's CFO would sign a contingent P.O. (hence, not finalizing the sale until its Board approved) requires some explanation. Cannington was involved in all hospital equipment purchases, doc. # 32 at 16, and he could personally approve purchases up to $5,000, *id.* at 18, but "the hospital authority [must] approve all [above-$5,000] equipment

---

[1] EMC has "denied" this assertion. Doc. # 35 ¶ 6. This Court has repeatedly warned that a party may not simply "deny" or "neither admit nor deny" an opposing party's evidentially supported S.D.Ga.Loc.R. 56.1 statement. *See, e.g., Tapley v. Collins*, 41 F.Supp.2d 1366, 1368 n. 1 (S.D.Ga. 1999), *rev'd in part on other grounds*, 211 F.3d 1210, 1216 (11th Cir. 2000). Instead, the nonmoving party must rebut the fact statement or show that it is not evidentially supported. Otherwise, the fact is established. *Id.* EMC simply "denied" doc. # 30 ¶ 6. Doc. # 35 ¶ 6. Hence, this fact would *otherwise* be established, except that Rule 56.1 cannot be used to establish legal conclusions. In a Uniform Commercial Code (UCC) case like this, confirmation of a sale is a legal conclusion, and that is how Ardus is using the word here. So, this particular "fact" is not established.

purchases unless it's an emergency." *Id.* at 17, 18.

Drake, in contrast, can approve of all routine (*e.g.*, medical supply) purchases, but "[a]ny piece of equipment that is of a non-routine nature she would have to bring to [Cannington for approval]." Doc. # 32 at 23. So, no one that Ardus dealt with had any authority to sign off on the $166,746 purchase at issue here. Cannington says that he made this clear to Ardus representatives while transacting with them on the instant pumps. Doc. # 32 at 32. Yet, EMC points to nothing in writing to confirm this.

Cannington also says that EMC was not going to buy the IV pump items except over time. Doc. # 32 at 29 ("Now, the idea was that we would purchase [the IV pumps] over the next year or two"); *id.* ("Because we did have [pre-existing] pumps that were still working. So, you know, [EMC's] idea was to purchase them over a certain period of time and we had to guarantee pricing for that period of time"). Cannington, then, thus conveyed that "over time" concept to Ardus during the one and only IV-pump meeting between EMC and Ardus representatives in which he participated. *Id.* at 29. So when he signed the 12/14/05 P.O. in question during that meeting, he included on it:

> COMMENT: PURCHASE UPON APPROVAL AND OTHER TERMS. OUT RIGHT PURCHASE OR LEASE DURING 12 MON. PER

*Id.* at 29-30 & exh. 8.

That wording, according to Cannington, means that EMC wanted to buy "a few of these pumps at a time," *id.* at 30, and thus, the pumps in fact would be shipped to EMC "over time." *Id.* at 31. He viewed his "contingent P.O." wording as a hedge maneuver (*i.e.*, lock in the pumps' price/availability now on a promise to pay for them later, as actually needed, and thus as each individual pump's purchase was finalized):

> And, the thing is, I'm the [CFO] of the hospital. If I can get pumps cheaper today than I can a month from now by giving a PO, especially when, you know, I'm not locked into it because it's contingent on board approval, then that's what I'm going to do and that's the decision I made.

*Id.* at 33. Cannington figured that he was making Ardus happy despite his hedging because he in effect would "earmark" the IV pumps in Ardus's inventory:

> A. And so, because the idea that I got from the representatives from Ardus was that they needed a PO before the end of the year. The impression I got was that this deal may not be available January the 1st.... And, so I made a decision at that time to give them a purchase -- I mean a purchase order contingent on board approval.... And the idea was that they would be shipped and we would be responsible for paying for them *as we ordered them*. In other words, we would call them and -- And, say we need twelve pumps, you know, and whatever the board had told us how we were going to purchase them.... And then we would go from there. And whatever it was that was purchased over the next year or so would be at these prices that had been negotiated.

*Id.* (emphasis added).

In the end, Cannington could not remember if this particular P.O. ever was taken to EMC's "finance committee" (a committee-layer, within EMC's bureaucracy, that one must cross before

obtaining "Board" approval) for final approval. *Id.* at 38; *id.* ("I mean, you know, we're talking about Christmas holidays"); *id.* at 39 (the finance committee recommends whether to approve of a purchase, and that recommendation is then taken to EMC's board for final approval).

Ardus shipped the IV pumps to EMC shortly after Cannington signed off on the "contingent P.O." *Id.* at 40. They arrived on 12/29/05. Doc. # 33 at 64. But EMC's Board had not approved of the purchase. Doc. # 33 at 64; # 32 at 86. As soon as Drake informed Cannington of the shipment's arrival, he "told her to contact Ardus and find out what happened." Doc. # 32 at 45. Meanwhile, Drake put the pumps in safe storage. Doc. # 33 at 72-73; # 32 at 55. Cannington instructed Drake not to let the pumps be used. Doc. # 32 at 61.

Sometime after delivery, Drake and Cannington joined in a conference call[2] with Ardus representatives[3] and informed Ardus that "we were not going to be -- We were not able to purchase the pumps, that we were not going to be able to keep the pumps. The board did not approve it and we did not have the money for the purchase." Doc. # 33 at 83; *see also* doc. # 32 at 64 ("You know, the board never approved it, and y'all shipped them in here. We didn't ask you to ship the[m] here. We graciously stored them for months, which is fine, but we have not ordered them, we have not used them, and we're not going to pay for them.... And, you can come get them").

Cannington and Drake depose that EMC communicated essentially the same message in some follow-up conference calls with Ardus. Doc. # 33 (Drake dep.) at 84-85; *id.* at 85 (Drake: "And, every -- And every conference call that I remember, [Cannington] would tell them that we could not buy all these pumps. We can't get -- We can't purchase these pumps"); *see also* doc. # 32 at 86 & exh. 9 at 5 (EMC Board 1/25/06 Meeting Minutes: "The purchase request for IV pumps was placed on hold for now"); *id.* at 89 (EMC stipulates that EMC did not decide the matter either way as of 1/25/06).

However, EMC never rejected the goods in *writing*. Doc. # 32 at 50 ("Q. So did you ever put anything in writing rejecting that invoice? A. No."). Cannington at one point did direct Drake to ship the pumps back but EMC did not because, Cannington claims, "Ardus had told us not to."[4] Doc. # 32 at 63; *id.* at 74 ("Q. Okay.

---

[2] Drake cannot remember when this contact occurred. Doc. # 33 at 82. Cannington thinks it was "five or six months after December [*i.e.*, after the date on which Ardus delivered the IV pumps to EMC]," doc. # 32 at 48, and pegs it to "[s]ometime subsequent to the [EMC] board meeting" that covered this topic. *Id.*; *see also id.* at 63-64 ("quite a few months afterwards"). EMC Board minutes show that the Board met on 1/25/06 and resolved to "place on hold" any decision on purchasing the IV pumps. Doc. # 32 exh. 9 at 1, 5; *see also* doc. # 35 (Daugherty Aff.).

Ardus claims, however, that it did not hear of any problem with the deal until "three to four months later" (*i.e.*, after the shipment), when it "called [EMC] about payment." Doc. # 37 at 31. In that Ardus and Cannington agree that EMC did not attempt any rejection until *months* after Ardus delivered the pumps, despite EMC board minutes showing the board refused to approve of the deal just *days* after the shipment, this fact (*i.e.*, that EMC did not communicate to *Ardus* its rejection until months after the shipment) is now established.

[3] Drake remembers that Shannon and someone named "Allison" joined in that call, doc. # 33 at 82, but Cannington remembers only Shannon. Doc. # 32 at 49. EMC generated no written records of that call. *Id.*

[4] This is, of course, hearsay, and EMC neither points to a hearsay rule exception nor shows how this testimony may otherwise be reduced to admissible form for trial -- a prerequisite for consideration on summary judgment.

3

Did you -- why did you make the decision to just not send the pumps back? A. We were told [by Ardus] not to send them back").[5]

After Drake received (subsequent to receipt of the IV pump shipment) Ardus's invoice, Cannington again told Drake to call Ardus and reject the shipment. Doc. # 32 at 51. Drake complied. She then told Cannington that Ardus admitted the invoice "was a mistake, that [it] went out automatically because the goods had been shipped, and that [Ardus] would take care of it." *Id.* at 52.[6]

According to Drake, Ardus tried to salvage the deal by offering trade-in credit for EMC's pre-existing IV pumps if they could be economically repaired. Doc. # 33 at 86. None of these conversations were reduced to writing either. *Id.* at 89.

Cannington likewise remembers Ardus's post-delivery ("this was like a year later") attempt to cut a deal "[a]fter the shipment of the goods" involving older IV pumps. Doc. # 32 at 68; *see also id.* ("[T]here was some conversations about ... having our biomedical engineer check [EMC's pre-existing IV] pumps. [¶] And, then if he thought they were worth being repaired, then we would send them to Ardus for repair. And, then Ardus was supposed to check the pump and find out how much it would cost and whether they thought it was worth being repaired or not before we would obligate ourselves to have them repaired"). But Cannington is uncertain about the details, much less how such proposed repairs were connected to the original P.O. and shipment. *Id.* at 69-70.

To this day EMC has retained possession of the Ardus IV pumps. Doc. # 30 ¶ 29; # 35 ¶ 29.

The purchasing milieu in which Cannington operated fostered the casual (*i.e.*, not bothering to reduce to writing any major agreement, much less EMC's claimed rejection of the goods) manner in which the present situation (Ardus now claims a six-figure contract was formed) unfolded:

Q. Okay. Do you feel that you or [Drake] did anything to contribute to this problem?

A. I think there were some things we could have done. I mean, in retrospect, that probably could have solved a lot of things. And, it's all the things you mentioned. Did we put it in writing, did we do this, did we do that.

---

*Macuba v. DeBoer*, 193 F.3d 1316, 1323 (11th Cir. 1999). It thus cannot be considered to establish this fact. *See Bozeman v. Orum*, 422 F.3d 1265, 1268 n. 1 (11th Cir. 2005) (hearsay statements are not evidence that can be considered at summary judgment stage).

In that respect, EMC does not argue that this was an admission by a party opponent. F.R.Evid. 801(d)(2). Nor has EMC endeavored to meet that hearsay exception's requirements, most notably the identity of the declarant and his/her authority to "make a statement concerning the subject...." Rule 801(d)(2)(C). The same may be said should EMC contend that this was a declaration against Ardus's interest. *See* Rule 804(b)(3) (declarant must be "unavailable" as defined under 804(a) and statement must have been "at the time of its making so far contrary to the declarant's pecuniary or proprietary interest, or so far tended to subject the declarant to civil ... liability, or to render invalid a claim by the declarant against another, that a reasonable person in the declarant's position would not have made the statement unless believing it to be true").

[5] Again, this is hearsay, and thus the same result obtains here. *See supra* n. 4. Cannington, meanwhile, felt comfortable storing the pumps in EMC so that EMC could have immediate access to them in the event its board approved the purchase. Doc. # 32 at 75; *see also id.* ("And, I'm surely not going to pay for shipping them [back to Ardus]").

[6] Likewise, this is hearsay. *See supra* n. 4.

4

The way I do business, you know, I'm a man of my word, and I'm very clear on it, and I've dealt with a lot of vendors in my experience and with contingent POs.

And everybody understands what a contingent PO is, or a PO pending board approval. And, I really didn't anticipate these problems.

Doc. # 32 at 77; *see also id.* at 78 (Cannington is no longer employed by EMC).

## III. ANALYSIS

### A. Governing Standards

There is no dispute that, since this case involves the sale of goods and not services, it is controlled by Georgia's Uniform Commercial Code (UCC) as codified at O.C.G.A. § 11-1-101 *et seq*. In that respect, the UCC is aimed at assisting commerce by facilitating a more informal method of forming contracts than in other (*e.g.*, the sale of real estate) contexts:

> [T]he UCC "expands our conception of contract. It makes contracts easier to form, and it imposes a wider range of obligations than before. Contract formation is easier in several ways. Parties may form a contract through conduct rather than merely through the exchange of communications constituting 'offer and acceptance.' ... Further, [UCC] Article Two reduces the formalities required for contract formation. The statute of frauds ([O.C.G.A. § 11-] 2-201) requires only a writing that 'indicate(s)' a contract was made, and [O.C.G.A. §§ 11-]2-206 and 2-207(1) abandon the requirement that an acceptance must coincide precisely with all terms of the offer. Section 2-204(3) states: 'Even though one or more terms are left open a contract for sale does not fail for indefiniteness if the parties have intended to make a contract and there is a reasonably certain basis for giving an appropriate remedy.'" White & Summers, Uniform Commercial Code, § 1-2.

*J. Lee Gregory, Inc. v. Scandinavian House, L.P.*, 209 Ga.App. 285, 289 (1993); *id.* (noting "the UCC's broad concept of contract"); *see also Jones v. Baran Co., LLC*, ___ Ga.App. ___, 2008 WL 788292 at * 2 (3/26/08) ("[E]ven though one or more terms are left open a contract for sale does not fail for indefiniteness if the parties have intended to make a contract and there is a reasonably certain basis for giving an appropriate remedy") (quotes and cite omitted).

The UCC contemplates that buyers and sellers will sometimes jockey for position and thus slip into their respective documents (*i.e.* purchase orders and invoices) conditions, contingencies, escape clauses, etc. *See generally* 1 HAWKLAND UCC SERIES § 2-207:4 (May 2008) (discussing, *inter alia*, "the '"mirror image' rule and its 'last shot' consequence"). And since the birth of a contract sometimes can be difficult to discern, HAWKLAND UCC SERIES § 2-204:2 (*Moment of formation not identified*) (May 2008), the UCC addresses that phenomenon, too. *Id.* ("If the parties have, in fact, come to an agreement as to the sales transaction, a contract is formed, even though an offer or acceptance cannot be isolated, or the moment the contract was made cannot be determined. Section 2-204(2) expresses this rule"); O.C.G.A. § 11-2-204(2).

In that regard, it is common for courts to fill in battle-of-the-forms-generated contract gaps with evidence of the parties' conduct showing contractual intent. *See, e.g., Gregory*, 209 Ga.App. at 289 (even if writings exchanged by

5

parties were not sufficient under the UCC to support finding that contract existed for sale of windows, court would nonetheless find that contract existed based on parties' conduct, where seller had partly performed contract by taking measurements for windows and buyer's cooperation had been necessary for seller's part performance; such conduct was inconsistent with theory that they had only agreed to agree even though they were later unable to agree as to whether payment guarantees would be made).

Despite the range of contracting informality that the UCC permits, there is a special rule that is used to cut through a lot of "fog":

> Uniform Commercial Code § 2-201(2) contains a special rule as to the statute of frauds signature requirement when two merchants are involved.[7] In substance, the provision constitutes an exception to the general statute of frauds requirement that a contract is only enforceable against a person who has signed the writing evidencing the contract. Under this exception, the silence of a merchant is the *equivalent* of signing the writing when the conditions in UCC § 2-201(2) have been met. However, unless these conditions have been met, an oral contract between merchants is subject to the ordinary statute of frauds rules and, therefore, cannot be enforced.

2 ANDERSON U.C.C. § 2-201:211 (*Generally*) (3d. ed. Dec. 2007) (footnote and emphasis added; footnotes omitted). Those conditions are that an invoice was sent with or shortly after the seller delivered goods to the buyer and the buyer -- if chargeable with knowledge of the invoice's contents -- failed to object to the invoice in writing, within ten days of the invoice's receipt. *Imex Intern., Inc. v. Wires EL*, 261 Ga.App. 329, 333 (2000); *Dalesso v. Reliable-Triple Cee of North Jersey, Inc.*, 167 Ga.App. 372, 373 (1993) (in action on an account, trial judge was justified in relying upon invoices as written confirmation of the contract between the parties where no written notice of objection was given to plaintiff within ten days of receipt by defendants).

It has been said, however, that "when it is apparent that the writing merely represents preliminary negotiations, the failure to reply does not take the transaction out of the statute of frauds." 2 ANDERSON U.C.C. § 2-201:211. So only if the invoice reflects a post-negotiations *agreement* may it serve to constitute a confirmation of the transaction for the purpose of UCC § 2-201(2). *Id.* And even at that, Anderson reminds, § 2-201(2) merely provides that the defense of the statute of frauds cannot be raised. It does *not* constitute proof that there was a contract or provide the terms of that contract. *Id.* Put another way, the buyer can still attack the existence of the contract or its terms; he just can't challenge it by claiming it was "only" oral. However, as will be discussed *infra*, this is not Georgia law.

**B. EMC's P.O. and Ardus's Invoice**

The core of the instant dispute is found in EMC's reliance on its "contingent" P.O., versus Ardus's reliance on its contingency-free invoice. Each side contends that their respective document figures into the agreement here. Doc. # 35 (brief) at 1-2 (EMC claims its P.O. placed

---

[7] "[A] purchaser can be considered a merchant where the purchaser is a business professional as opposed to a casual or inexperienced seller or buyer, and the purchase involves a type of goods related and necessary to the business or occupation of the purchaser." *Ready Trucking, Inc. v. BP Exploration & Oil Co.*, 248 Ga.App. 701, 704 (2001) (quotes and cites omitted). Whether a party is a "merchant" under the UCC is a question of law for the court. *Id.* at 703. Here there is no dispute that EMC qualifies as a "merchant," and the Court will treat it as one.

6

an open-ended contingency on its agreement to purchase the IV pumps); # 39 at 3 (Ardus insists that, under O.C.G.A. § 11-2-202, its invoice became "the final expression of the parties['] agreement with respect to the terms that are included therein when the receiving party fails to [object] to the writing as required by § 11-2-201. O.C.G.A. § 11-2-202").

There is some support for an argument that EMC's P.O. (doc. # 32 exh. 8) was a purchase offer that Ardus, by shipping the pumps in response to it, accepted -- including, then, the P.O.'s terms. *See Pycsa Panama, S.A. v. Tensar Earth Technologies, Inc.*, 2008 WL 1775409 at * 44 (S.D.Fla. 4/16/08) (unpublished); *Cogent Computer Systems, Inc. v. Turbochef Technologies, Inc.*, 2008 WL 219343 at * 10 (D.R.I. 1/24/08) (unpublished); GA. CONTRACTS LAW AND LITIGATION § 3-9 (*Contract formation under the UCC--Generally*) (2007).

To the extent that Ardus's invoices materially altered that offer, this argument goes, such additional terms resulted in surprise or hardship and thus should not be deemed incorporated into the contract for want of express advance awareness (thus, consent) by EMC. *See Dixie Aluminum Prods. Co. v. Mitsubishi Int'l Corp.*, 785 F.Supp. 157, 160 (N.D.Ga. 1992) (discussing the UCC Comment to section 2-207, which explains that a clause "materially alters" the contract if it results in unfair surprise).

But EMC does *not* argue that its P.O. was an offer that Ardus accepted. Instead, it claims that at most Ardus formed with it a *verbal* agreement and EMC's contingent P.O. constitutes evidence (of the agreement's terms) on that score. Doc. # 35 (brief) at 4-5. So § 11-2-201(2), EMC reasons, at most prevents EMC from invoking the statute of frauds as a defense to the existence of an *oral* EMC-Ardus contract.[8] Hence, EMC's failure to object to Ardus's invoice merely prevents EMC from arguing that the Ardus-EMC contract is oral and thus is unenforceable on that basis. Ardus must still prove, says EMC,

> and a jury would have to determine, that a *verbal* contract was created which was subsequently confirmed by written invoices made enforceable by [EMC's] failure to object within ten (10) days. [Hence, EMC contends, t]here still must have been a meeting of the minds and an agreement to purchase not subject to any other unmet obligations. It is, of course, [EMC's] position that any agreement was always subject to the hospital authority's approval and that condition was never met. All of these are factual disputes which cannot be resolved on a motion for summary judgment.

---

[8] An oral contract can be binding, but not if it is one of those specifically identified by the Statute of Frauds; then the contract must be in writing and signed in order to be enforceable. The Georgia Statute of Frauds extends to, and thus deems unenforceable, oral contracts in the following categories: (1) any promise by an executor, administrator, guardian, or trustee to pay damages out of his own estate; (2) any promise to answer for the debt, default, or miscarriage of another; (3) any agreement made upon consideration of marriage; (4) any contract for sale of land, or any interest in, or concerning land; (5) any agreement that is not to be performed within one year from the time the agreement is made; (6) any promise to revive a debt barred by a statute of limitation; (7) any commitment to lend money; and (8) any contract for the sale of goods for the price of $500.00 or more. O.C.G.A. § 13-5-30 and § 11-2-201. Under Georgia's specific UCC provision governing oral contracts (*i.e.*, O.C.G.A. § 11-2-201(2)), an enforceable "oral" contract can be formed between merchants if, within a reasonable time, a writing that confirms the existence of the oral contract is received by a contracting party and that party has reason to know its contents -- *unless* that party issues a written rejection notice with 10 days after he receives it. *Id.*

7

Doc. # 35 (brief) at 4-5 (emphasis added).

EMC is referring to the verbal negotiations between Drake, Cannington, and Shannon that resulted in Ardus shipping the pumps with a follow-up invoice that failed to acknowledge the core feature of the parties' verbal agreement (the "board-approval" contingency).

However, EMC cannot dodge the fact that (a) at most EMC promised to have its board *consider* buying the IV pumps; (b) that constitutes the *essence* of an illusory (hence, non-existent) contract;[9] and (c) without saying so, then, EMC in effect is arguing that *no* contract was formed here. And if that is the case, then this Court should rule on the issue as a matter of law.

To bolster this defense, EMC reminds the Court "that one purpose of [UCC] Title 2 ... is to provide a method of enforcing *verbal* contracts between merchants," doc # 35 (brief) at 6 (emphasis added), but "there must still exist a contract to be enforced." *Id.* at 6. EMC then repeatedly illuminates its promise to have its board consider whether to later promise, or not, to buy the IV pumps in question (hence, it promised to *maybe* buy the IV pumps at some later point -- the essence of an illusory promise).

To summarize EMC's argument: EMC does *not* argue that its P.O. was an offer (nor, for that matter, that it was "modified" by Ardus's invoice). Instead, it argues that any agreement was always subject to its board's approval, and that condition was never met. Hence, there is no contract here. And even though EMC's failure to timely reject Ardus's invoice strips EMC of its Statute of Frauds (that the contract was oral and thus unenforceable on that ground alone), EMC can still argue that the parties' minds never met (hence, there is no contract to begin with) and, if Ardus claims otherwise, then a jury must resolve this matter.

Boiled down, then, this case presents a classic "battle of the forms" dispute: EMC wanted to buy the pumps over time *if* its board in fact decided, at some point, to buy them *at all*. EMC communicated this in its "hedgy" P.O. Ardus refused those terms and instead shipped its pumps to EMC with a contingency-free invoice. EMC now insists that the P.O. and invoice together at best reflect an oral contract that a jury should resolve -- with EMC coyly ignoring the fact that EMC would otherwise win this case on illusory (*see supra* n. 9) grounds (*i.e.* because EMC at most agreed to consider purchasing the pumps in the future, no contract was ever formed). Doc. # 35. Ardus, to the contrary, says that there is *no* oral contract and that instead its un-rejected invoice formed the contract, on the invoice's terms, which this Court should now enforce. Doc. ## 29, 39.

C. Invoice Contract

While this is a close case, Ardus must prevail on its "invoice-contract" argument. The parties agree that EMC cannot invoke Georgia's UCC-Statute of Frauds, which is removed as a defense so long as "'there is some writing sufficient to indicate that a contract for sale has been made between the parties and signed by the party against whom enforcement is sought or by his authorized agent or broker.' OCGA § 11-2-201

---

[9] Illusory promises cannot support a legally enforceable contract. *See, e.g., Caley v. Gulfstream Aerospace Corp.*, 428 F.3d 1359, 1373-74 (11th Cir. 2005) (under Georgia contract law, offeror's promise is "illusory " where words of promise, by their terms, make performance entirely optional with offeror whatever may happen, or whatever course of conduct in other respects he may pursue); Restatement (Second) of Contracts § 77 (Illusory And Alternative Promises) (1981) ("Words of promise which by their terms make performance entirely optional with the 'promisor' do not constitute a promise").

8

(1)." *Jones,* 2008 WL 788292 at * 4. And EMC concedes that, by failing to timely reject Ardus's invoice, EMC "signed" (by its conduct) the writing (Ardus's invoice) against whom (EMC) enforcement (by Ardus) is sought. Doc. # 35 (brief) at 2-5.

To that end, the Court agrees with EMC that this case is not unlike *Jem Patents, Inc. v. Frost,* 147 Ga.App. 839 (1978). Jem sued Frost to collect the purchase price of merchandise that Frost had allegedly contracted with Jem to purchase. *Id.* at 839. Frost denied liability, contending that he had placed no written order for Jem's goods, which had been delivered to him -- along with quantity/price invoices -- in response to what Jem said was a verbal order from Frost. *Id.* Frost retained the goods for 3 weeks without objecting, then tried to return them but Jem refused to take them back. *Id.*

At trial the court directed a verdict in favor of Frost on the ground that Jem had failed to introduce written evidence of the contract in compliance with what is now § 11-2-201(1). *Id.* Reversing, the appeals court held that Jem's invoices were sufficient to constitute written confirmation of the verbal order and that, even if written confirmation were lacking, liability could also be predicated on evidence that Frost had accepted the goods (Frost had failed, within 10 days, to give Jem written notice of Frost's objection to Jem's invoices). *Id.* at 839-40. Thus, a jury would be authorized to find that an enforceable contract existed under § 11-2-201(1). *Id.* at 840. The case therefore was remanded for retrial. *Id.*; *see also Jem Patents, Inc. v. Frost,* 156 Ga.App. 311 (1980) (appeal following retrial).

EMC cites *Jem* to support its argument that a jury must resolve whether the instant parties' minds met. Doc. # 35 (brief) at 4. Not argued in *Jem,* however, was what was raised in *Ready Trucking,* and now argued by Ardus here (doc. # 39 at 3): that the invoice's unrejected written terms were binding. In *Ready Trucking,* a motor carrier (Ready) sued a fuel seller (BP) for breach of contract, alleging that BP agreed to sell Ready fuel at a price that included all applicable sales taxes. 248 Ga.App. at 701. But BP's invoices to Ready revealed that BP never collected and paid to the State the sales taxes. *Id.* at 703.

BP in effect claimed that this constituted an agreement between the parties that the missing taxes would not be collected and remitted to the State by BP (the State then exercised its statutory option to pursue the buyer -- Ready -- for the uncollected taxes). *Id.* Rejecting Ready's contract-breach claim against BP, the *Ready* court concluded that Ready's failure to apprehend what was otherwise clearly reflected on BP's invoices (*i.e.*, that BP in fact had not collected and remitted the sales taxes) doomed its case; Ready had reason to know the invoice's terms and therefore such terms could not now be varied:

> Under these circumstances, the Georgia codification of the [UCC] resolves this dispute. Article 2 of the UCC governs transactions involving the sale of goods. Where the sale of goods is "between merchants," the sales invoices constitute written confirmation of their agreement. As "between merchants," if within a reasonable time a writing in confirmation of the contract and sufficient against the sender is received and the party receiving it has reason to know its contents, it [constitutes a writing enforceable] against such party unless written notice of objection to its contents is given within ten days after it is received. OCGA § 11-2-201(2). *See Jem Patents v. Frost,* 147 Ga.App. 839, 250 S.E.2d 547 (1978).

Further, that writing then becomes the "*final expression* of their agreement with respect to such terms as are included therein," and it "may *not* be contradicted by evidence of any prior agreement...." OCGA § 11-2-202.

*Id.* at 703-04 (emphasis added; cites and interior paragraph indentation omitted); *see also id.* at 704 ("The invoices constitute an enforceable writing confirming the terms of the agreement, and they constitute an agreement between the parties that the ... missing taxes would not be collected and remitted by BP"). This holding has been criticized:

> The court, in not understanding the effect of UCC § 2-201(2), held that since both parties were merchants, the failure of the buyer to object to the invoice made the terms of the invoice binding on the buyer. The court failed to understand that the only consequence under UCC § 2-201(2) of the buyer's failure to respond to a confirmation is that the buyer could not assert the statute of frauds. It does not, as the court claimed, make the confirmation a final expression of the parties agreement for purposes of UCC § 2-202.

2 ANDERSON U.C.C. § 2-201:257 (*Particular applications*) (3d. ed. Dec. 2007). Another encyclopedist, without specifically mentioning *Ready Trucking*, agrees:

> The concept of finality is an important limitation on the parol evidence rule, because it means that not all writings are protected by that rule. For example, there is no finality of agreement in a memorandum that is sent by one party to the other. The fact that the recipient does *not* reject it may deprive him of the protection of the statute of frauds under Section 2-201(3), but the failure to reject does not prevent the recipient showing that the terms of the contract are different from those stated in the memorandum, or, indeed, that no contract ever came into existence. This idea is reinforced by the language "confirmatory memoranda" found in Section 2-202, indicating that more than one memorandum is necessary to establish the kind of final written expression that is needed to make the parol evidence rule operate.

1 HAWKLAND UCC SERIES § 2-202:2 (*Final written agreement*) (May 2008) (footnotes omitted; emphasis added); *see also id.* § 2-201:5 (*Satisfying the statute--Letters of confirmation*).

Nevertheless, no one has shown this Court that *Ready Trucking* does not constitute Georgia law. In that this case is founded on diversity jurisdiction, doc. # 1 at 1, this Court is bound to follow it. *CSX Transp. v. Trism Specialized Carriers*, 182 F.3d 788, 791 (11th Cir. 1999) ("Without some persuasive indication that the state's highest court would rule otherwise, we are bound to apply the law as decided by the Georgia Court of Appeals"); *accord National Union Fire Ins. Co. v. Cavins*, 226 Fed.Appx. 895, 899 (11th Cir. 2007).

On this point, then, Ardus is entitled to summary judgment. *Dalesso v. Reliable-Triple Cee of North Jersey, Inc.*, 167 Ga.App. 372, 373 (1993) (in action on an account, trial judge was justified in relying upon invoices as written confirmation of the contract between the parties where no written notice of objection was given to plaintiff within ten days of receipt by defendants). The Court can therefore summarily rule here that the two parties agreed on quantity and price, as reflected on the Ardus invoice that EMC failed to (in writing) reject.

### D. EMC's UCC Rejection Defense

That brings the Court to EMC's next defense -- that it may reject the IV pumps as nonconforming. The following UCC rules apply:

> The buyer is entitled to accept or reject goods which fail to conform to the contract by rejecting or accepting the whole, or by accepting any commercial unit or units (*see* O.C.G.A. § 11-2-105 (6)), and rejecting the rest. O.C.G.A. § 11-2-601. Acceptance occurs when, after a *reasonable* opportunity to inspect the goods, the buyer indicates the goods are conforming or that he will take them despite the nonconformity, or the buyer acts in a manner *inconsistent* with the seller's ownership. O.C.G.A. § 11-2-606. Acceptance of any part of a commercial unit is acceptance of the whole unit. O.C.G.A. § 11-2-606(2).

*Prudential Metal Supply Corp. v. Atlantic Freight Sales Co.*, 204 Ga.App. 439, 440 (1992) (emphasis added), cited in *Imex*, 261 Ga.App. at 334; *see also* 14 WILLISTON ON CONTRACTS § 40:16 (*Timeliness and sufficiency of rejection*) (4th ed. May 2008) ("It is generally recognized that the buyer's notice of rejection can be oral, although there is authority to the contrary") (footnote omitted).

Here, whatever EMC may be proved to have said orally (no one cites to any writing), it nevertheless acted (by retaining the IV pumps to this day) in a manner inconsistent with Ardus's ownership. Or did it? Arguably a jury must resolve the matter, as Ardus claims that Drake informed it that EMC's board in fact *had* approved of the IV pump purchase, doc. # 37 at 31,[10] while EMC's deponents depose otherwise, and also claim that Ardus told EMC to not return the pumps.[11] However, it is undisputed that it was not until "three to four months" after Ardus delivered the IV pumps to EMC that EMC first informed Ardus of EMC's "contingency-rejection" (*i.e.*, that its board still had not approved of the purchase but EMC would store the pumps at EMC in the meantime). *Id.* Hence, that particular delay is a key issue.

Case law speaks to what constitutes a reasonable time to reject. *See, e.g., Dan J. Sheehan Co. v. Ceramic Technics, Ltd.*, 269 Ga.App. 773, 775 (2004) (contractor failed to provide timely notice to supplier after receipt of tiles that it claimed were defective, in order to prevail on breach of contract defense to supplier's claim on open account; tile received by contractor was installed, letter notifying supplier that tiles did not comply with dimensional specifications was not sent until four months after receipt of initial shipment and two and one-half months after receipt of last shipment, and there was dispute among tile experts as to whether eventual problems with tile were caused by tile that was the wrong size or from improper installation, and continued use of tile constituted reacceptance); *Imex* 261 Ga.App. at 333 (buyer of plastification machine used in manufacture of diamond wire accepted machine on delivery and had no subsequent right to reject for nonconformity, where buyer had opportunity to inspect machine in Italy, buyer did not request additional time to inspect or request sale on approval, and buyer admitted that seller made tender of delivery and that it received delivery of machine); *see also id.* at

---

[10] This runs into the same hearsay considerations discussed in note 4 *supra*.

[11] Again, *see supra* n. 4.

334 (letter from buyer of plastification machine to seller rejecting machine nearly six months after delivery date was ineffective wrongful rejection).

Given the undisputed facts here, no rational jury could find that EMC seasonably and reasonably rejected Ardus's shipment. Per the Court's Part III(C) ruling *supra,* the sale here was completed and months went by before EMC mentioned *anything,* let alone words of rejection. EMC's rejection rights therefore terminated. *See, e.g., Bicknell v. B & S Enterprises,* 160 Ga.App. 307, 309 (1981) (buyer, with ample opportunity to inspect automobile to ascertain whether it conformed with description in bill of sale before she took possession of it and signed bill of sale and financing documents, had no subsequent right to reject automobile for nonconformance). Ardus therefore is entitled to summary judgment on this defense, too.

### E. EMC's UCC Revocation Defense

EMC nevertheless raises a failure of consideration (hence, revocation) defense. Doc. # 35 at 5; # 21. It argues that, even if there was an acceptance, O.C.G.A. § 11-2-608(1) allows it to revoke its acceptance after discovering that the IV pumps are defective or otherwise fail to conform with what Ardus promised. *Id.*

More specifically, EMC argues that the IV pumps are the subject of a nationwide recall, and thus it never would have accepted such devices because they are unusable to EMC. Doc. # 35 (brief) at 1-2. Ardus counters that: (a) EMC's CEO's testimony (that EMC would not allow the pumps to be used in EMC and thus they are of no value) should be rejected as self-serving; (b) Ardus tested and thus ensured that none of the pumps it shipped to EMC bore the "error codes" identified in the nationwide recall; and (c) in any event, once Ardus repairs/upgrades each pump, it will be superior to the original. Doc. # 39 at 4-5; *see also* doc. # 37 at 22-23.

More importantly, says Ardus, the delivery of the pumps that were promised constitutes legally sufficient consideration to support the enforcement of the contract. Doc. # 39 at 6-7. And EMC, meanwhile, is free to work out any problems it has under the contract's warranty. *Id.; see also* doc. # 37 at 35 (Ardus: "And, remember, you've got the five year warranty on this equipment. And, what we'd do is we'd probably say the five year warranty starts from the day you guys actually implement the product and not from, you know, January of '06").

More UCC rules must be consulted here:

Although acceptance of goods precludes subsequent *rejection,* a buyer, upon notice to the seller, has a right to *revoke* acceptance of goods whose nonconformity substantially impairs their value to him. The buyer may exercise this right in two situations: (1) where he reasonably assumed that the nonconformity would be cured by the seller, and (2) where the defect was not discovered on inspection, if acceptance was reasonably induced either by the difficulty of discovery or by the seller's assurances. Revocation of acceptance must occur within a *reasonable time* after the buyer discovered or should have discovered the grounds for it, and before any substantial change in condition of the goods which is not caused their own defects. By the same token, acts by the seller, such as an adjustment to an account, may indicate a revocation of acceptance. Revocation of acceptance is an available remedy, even where the contract contains limitations of warranty, especially where the buyer would otherwise be without a

remedy.

Ga. CONTRACTS LAW AND LITIGATION § 11-11 (2007) (quotes and footnotes omitted; emphasis added).

The Ardus deposition in the record of this case evinces Ardus's agreement that there may be problems with the instant pumps. Doc. # 37 at 21-26. In fact, Ardus says that it is willing to work with EMC on this issue. *Id.*

However, EMC points to no evidence showing that, within a *reasonable time* after it discovered or should have discovered the revocation grounds (*i.e.*, the pumps are subject to a "recall") it revoked its acceptance here. Indeed, EMC still *has* the pumps in its possession. And it does not rebut Ardus's assertion that EMC is free to invoke Ardus's five-year warranty, in which case it will wind up with pumps superior to the originals. Ardus therefore is entitled to summary judgment on this defense, too. In that EMC is now out of defenses, Ardus prevails on all of its claims.

## IV. CONCLUSION

Accordingly, the Court *GRANTS* plaintiff Ardus Medical, Inc.'s motion for summary judgment. Doc. # 27. The parties shall confer and present a proposed judgment within 10 days of the date this Order is served. Otherwise, this case is now *CLOSED*.

This  7  day of May, 2008.

B. AVANT EDENFIELD, JUDGE
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF GEORGIA